In the

# United States Court of Appeals
## For the Seventh Circuit

———————————

Nos. 23-2434, 23-2450, 23-2479, & 23-2652

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

SEAN CLEMON, DOMINQUE MAXWELL, WARREN G. GRIFFIN,
and FRANK SMITH,

*Defendants-Appellants.*

———————————

Appeals from the United States District Court for
the Southern District of Illinois.
No. 3:21-cr-30003-DWD — **David W. Dugan**, *Judge.*

———————————

ARGUED DECEMBER 11, 2025 — DECIDED AUGUST 4, 2026

———————————

Before RIPPLE, SCUDDER, and KIRSCH, *Circuit Judges*.

SCUDDER, *Circuit Judge*. Frank Smith, Warren Griffin, Dominque Maxwell, and Sean Clemon received life sentences after a jury found them guilty of multiple federal crimes, including under the federal racketeering statute. The convictions stem from acts, including murder, committed in furtherance of their roles in the Gangster Disciples. On appeal the defendants challenge multiple aspects of their trial. One issue

gives us substantial pause. The district court admitted scores of coconspirator statements without taking sufficient steps, especially before trial, to ensure compliance with the requirements of Federal Rule of Evidence 801(d)(2)(E).

The government bears its share of responsibility. It opposed a pretrial measure through which it could have both identified the coconspirator statements it intended to offer and provided accompanying explanations of how each statement would meet the admissibility requirements of Rule 801(d)(2)(E). *Santiago* proffers, as we call them in our circuit, give the defense opportunities to object before trial and enable the district court to make informed determinations about how best to handle a particular statement.

Rejecting the defendants' motions, the district court required no *Santiago* proffer, instead choosing to conditionally and wholesale admit the coconspirator testimony at trial. This approach left the defendants to show error after the fact. What resulted is a record presenting an extraordinary challenge for everyone—foremost for the defendants, but also for the government and us as a court of review—to untangle.

In the end, having invested substantial time reviewing what transpired at trial, we affirm. Troubled though we are by the district court's decision not to require a *Santiago* proffer, we are unable to identify any ultimate error in admitting coconspirator statements. Along the way we offer what we hope is helpful guidance to avoid this circumstance in future cases of like complexity requiring applications of Rule 801(d)(2)(E).

# I

## A

The evidence at trial showed that the Gangster Disciples is a nationwide criminal gang that originated in Chicago and operates in and out of prisons. Like many sophisticated organizations, the Gangster Disciples has a governance hierarchy. The gang's founder and chairman, Larry Hoover, despite his lengthy incarceration, is still the recognized leader. Board members serve under Hoover and manage the gang's affairs. Below the board are "governors of governors" who manage regionally. One step further down are governors who run the Gangster Disciples within states or other specified areas.

Leadership disputes arose about ten years ago. And, for our purposes, an important development occurred in the wake of board member Shauntay Craig's indictment on federal charges in Georgia in 2016. Some Gangster Disciples remained loyal to Craig and his faction, while others aligned with defendant Frank Smith and his cohort, which included Anthony Dobbins and defendant Warren Griffin. These internal tensions over the gang's governance eventually erupted into the violence leading to the prosecution in this case.

We begin with Anthony Dobbins—a Gangster Disciple and former defendant in this case who pleaded guilty. He spent several years up until 2017 incarcerated with Larry Hoover within the federal maximum security prison in Florence, Colorado. Dobbins and Hoover grew close and in time Dobbins received a promise of a board appointment. Dobbins also assured Warren Griffin of a seat on the board.

Dobbins and Griffin communicated often by letter and phone, and their discussions, loads of which the jury heard

during the trial, showed that they planned to enhance their power in the gang after Dobbins' release from Florence Supermax—all in response to Hoover's reported displeasure with the direction of the Gangster Disciples in certain regions.

Griffin took action to install loyal subordinates in early 2018. After months of expressing frustration with the Gangster Disciples' governor of Missouri, Dushawn Wharton, Griffin directed that Christopher Blount assume that role, at least temporarily. To publicize this change, Blount planned an event for April 28, 2018 at Matthews Park in Bridgeton, Missouri. But Wharton crashed the gathering and refused to recognize a successor. Defendants Sean Clemon and Dominque Maxwell reacted by calling defendant Frank Smith on the phone, who ordered them to attack Wharton. A firefight ensued that wounded Wharton and killed his associate Leroy Allen.

Griffin's next move was to eliminate dissent within the Gangster Disciples. He and Dobbins had regularly expressed discontent with older Gangster Disciples who they believed did not support their and Hoover's vision. One such member was Ernest Wilson. On May 18, 2018, just one month after the shootout in Matthews Park, Griffin and Dobbins traveled to Chicago and murdered Wilson.

B

These two murders triggered a federal investigation that resulted in the prosecution of seven members of the Gangster Disciples—Frank Smith, Warren Griffin, Anthony Dobbins, Sean Clemon, Dominque Maxwell, Perry Harris, and Barry Boyce. The initial indictment alleged RICO violations, murder

and attempted murder in aid of racketeering, and various firearm offenses.

Following extensive pretrial proceedings, during which several defendants pleaded guilty, a 23-day jury trial proceeded against defendants Griffin, Smith, Clemon, and Maxwell on charges in a superseding indictment. The jury heard testimony from law enforcement, former Gangster Disciples, eyewitnesses, and a variety of experts, and in the end returned guilty verdicts on all counts. The district court later sentenced each defendant to life.

As we proceed to the issues before us on appeal, it becomes important to keep track of the charges against each defendant, the conduct at issue, and the jury's verdict. The chart on the following page aids in that effort.

| | Superseding Indictment | | | | | |
|---|---|---|---|---|---|---|
| | | | Defendant/Appellant | | | |
| Count | Charge and Statute | Event | Warren Griffin | Frank Smith | Sean Clemon | Dominque Maxwell |
| 1 | Racketeering Conspiracy 18 U.S.C. § 1962(d) | Murders, drug dealing, witness tampering, and other crimes | Guilty | Guilty | Guilty | Guilty |
| 2 | Murder in Aid of Racketeering 18 U.S.C. § 1959(a)(1) | Murder of Leroy Allen at Matthews Park in Missouri | N/A | Guilty | Guilty | Guilty |
| 3 | Firearm Use During a Crime of Violence 18 U.S.C. § 924(c)(1)(A) | | N/A | Guilty | Guilty | Guilty |
| 4 | Firearm Use During a Crime of Violence Causing Death 18 U.S.C. § 924(j)(1) | April 28, 2018 | N/A | Guilty | Guilty | Guilty |
| 5 | Attempted Murder in Aid of Racketeering 18 U.S.C. § 1959(a)(5) | Attempted Murder of Dushawn Wharton at Matthews Park in Missouri | N/A | Guilty | Guilty | Guilty |
| 6 | Firearm Use During a Crime of Violence 18 U.S.C. § 924(c)(1)(A) | April 28, 2018 | N/A | Guilty | Guilty | Guilty |
| | Counts 7-10 Dismissed | | | | | |
| 11 | Murder in Aid of Racketeering 18 U.S.C. § 1959(a)(1) | Murder of Ernest Wilson in Chicago | Guilty | N/A | N/A | N/A |
| 12 | Firearm Use During a Crime of Violence 18 U.S.C. § 924(c)(1)(A) | | Guilty | N/A | N/A | N/A |
| 13 | Firearm Use During a Crime of Violence Causing Death 18 U.S.C. § 924(j)(1) | May 18, 2018 | Guilty | N/A | N/A | N/A |

## II

## A

Nearly six months before trial, defendant Sean Clemon submitted a motion alerting the district court that, based on the discovery to date, the government was sure at trial to introduce many statements from coconspirators pursuant to Federal Rule of Evidence 801(d)(2)(E). This Rule permits the admission of coconspirator statements that are made during and in furtherance of a conspiracy without violating the general prohibition on hearsay. Much of the ultimate evidence here took the form of statements within telephone calls, letters, and the like between and among members of the Gangster Disciples, including some of the defendants. Knowing the weight jurors could afford this kind of evidence, Clemon requested an order directing the government to make a preliminary showing of its conditional admissibility by proffering what coconspirator statements it would offer at trial. Smith and Griffin did too.

But the government resisted, not by disputing that it intended to offer a substantial number of coconspirator statements, but instead by insisting both that the law did not compel a pretrial proffer and that the district court could handle admissibility questions contemporaneously during trial.

The district court denied the defendants' motions, thinking the better course was to conditionally admit the evidence. It left it to the defendants to object at trial to any statements they believed inadmissible under Rule 801(d)(2)(E).

And object the defendants did, over and over. During the opening days of trial, for example, Warren Griffin objected to the admission of Government Exhibit 3, a letter he received

from Anthony Dobbins while Dobbins was serving time in the Florence Supermax prison with Larry Hoover. In the letter, Dobbins discussed his relationship with Hoover and appointment to the Gangster Disciples' board while also encouraging Griffin to keep faith in the organization.

In explaining the objection, Griffin's counsel underscored a broader concern about the trial evidence. Counsel explained that the defendants anticipated that Exhibit 3 was just the tip of the iceberg, as the government was sure to introduce scores of similar letters and recorded phone calls containing statements of coconspirators throughout trial. So too, of course, did counsel know, likely from experience in similar cases, that the government was certain to elicit similar statements from its cooperating witnesses—current and former members of the Gangster Disciples.

Counsel's concern was both substantive and practical: not only did the defendants want to hold the government to the requirements of Rule 801(d)(2)(E), they also presumably knew that the conditional admissibility of stockpiles of coconspirator statements brought with it a risk of prejudice, as it would be hard for jurors to disregard those statements even if the court later found them inadmissible and gave a limiting instruction. Defense counsel must have also worried about the risk of guilt by association—with the government relying on statements of coconspirators to show that the defendants were guilty of committing very serious crimes, including murder, because they knew and worked with the declarants as part of their common membership in the Gangster Disciples.

For its part, the government responded to Griffin's objection by saying little more than that the statements in Exhibit 3

were admissible because Dobbins made them at a time when he and Griffin were undeniably close associates within the Gangster Disciples and that the communications related to the gang.

The district court seemed to sidestep Griffin's objection to Exhibit 3, as well as his broader concerns, by focusing not on the requirements of Rule 801(d)(2)(E), but instead on considerations of authenticity. As best we can tell, the district court concentrated on whether Dobbins wrote the letter and, similarly, whether Griffin received it. Because the letter was authentic, the district court observed, "I'm not even sure it's hearsay." So the court overruled the objection to Exhibit 3 and admitted the letter without addressing the larger concern about coconspirator statements raised by Griffin's counsel.

By way of a second example, consider what transpired with the admission of Government Exhibit 4, a letter from Anthony Dobbins to another Gangster Disciple named Ramone Williams. Griffin objected, invoking the same basis as his previous objection. The government responded with only, "801(d)(2)(E)." The district court asked, "Is it linked up then?" and the government responded, "It will be." The district court overruled the objection.

Similar offers of evidence, objections, and rulings on admissibility happened numerous times throughout trial. It got to the point where the district court was merely confirming with the government that Rule 801(d)(2)(E) was the basis of admissibility. And at one point, the district court rejected an offer by Griffin's counsel to go line by line through an exhibit to explain why it contained inadmissible hearsay. Despite the complexity of this case and the overwhelming number of exhibits, the district court chose to admit the evidence

contingent on the government proving all necessary factors for admissibility at some point as the trial moved forward.

On February 7, the eighth day of trial, the district court issued an order directing the defendants to submit written objections, "specifically identifying the statement(s) for which the Defendant claims that the Government did not meet its burden under Rule 801(d)(2)(E)" no later than the close of the government's case. The order sought to position the district court to close the loop on its pretrial conditional admissibility ruling—to allow the court to make a final admissibility determination in light of the full trial evidence and whether it satisfied the requirements of Rule 801(d)(2)(E).

In response, the defendants who objected pretrial renewed their objections in motions near the end of trial. The district court announced on March 1, 2023, the day closing arguments began, that it was overruling the Rule 801(d)(2)(E) objections and followed up with a written order just over a week later. It was understandably frustrated, as Frank Smith was the only defendant whose counsel even "attempted to identify specific statements that it claimed to be hearsay and not subject to the co-conspirator exception." The others objected only by challenging the admissibility of entire documents and records—an approach that likely perplexed the court given how much pretrial emphasis defense counsel put on the need for a detailed, statement-by-statement *Santiago* proffer.

The district court offered these reasons for denying the motions. *First*, the court found that many of the exhibits did not contain hearsay at all, as many statements within those exhibits were not offered for their truth and more reflected idle, harmless "chatter." *Second*, the district court determined that one or more expansive conspiracies existed among the

Gangster Disciples, including among the defendants. Any statements, therefore, were admissible under Rule 801(d)(2)(E) because they were made in furtherance of a conspiracy, or, if not, under some other hearsay exception. *Third*, the district court concluded, without accompanying explanation, that any erroneous admission under Rule 801(d)(2)(E) "did not prejudice any substantial right of a Defendant."

B

Warren Griffin, joined by other defendants, now challenges the district court's admission of scores of exhibits, many filled with numerous statements by coconspirators. We begin with important legal framing.

The Federal Rules of Evidence define hearsay as an out-of-court statement offered for the truth of the matter asserted. See Fed. R. Evid. 801(c). And it is generally not admissible. See Fed. R. Evid. 802. Because hearsay statements are not subject to cross-examination or given under oath, they can lack reliability. See John Henry Wigmore, *Wigmore on Evidence: Evidence in Trials at Common Law* § 1362 (2026 ed.) ("The theory of the hearsay rule is that the many possible deficiencies, suppressions, sources of error and untrustworthiness, which lie underneath the bare untested assertion of a witness, may be best brought to light and exposed by the test of cross-examination."); see also Ronald J. Allen et al., *An Analytical Approach to Evidence: Text, Problems, and Cases* 447 (6th ed. 2016) (same).

But Rule 801 also tells us that some out-of-court statements are not hearsay. One category includes statements by an opposing party, which in a criminal case is generally the defendant if the government offers the statements. See Fed. R.

Evid. 801(d)(2)(A). Another closely related category, and the one at issue here, covers statements made by a "coconspirator during and in furtherance of the conspiracy." Fed. R. Evid. 801(d)(2)(E). To admit a coconspirator's out-of-court statements under Rule 801(d)(2)(E), the district court must find "by a preponderance of the evidence that (1) a conspiracy existed, (2) the defendant and the declarant were involved in the conspiracy, and (3) the statements were made during and in furtherance of the conspiracy." *United States v. Davis*, 845 F.3d 282, 286 (7th Cir. 2016).

Various rationales justify the admissibility of coconspirator statements. Perhaps the most common reason is that, by virtue of being part of a conspiracy, coconspirators authorize, directly or implicitly, the statements of other members of the conspiracy. See 30B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 6777 (2026 ed.) ("Statements are admitted because 'each member of a conspiracy is the agent of each of the other conspirators whenever he is acting—including speaking—to promote the conspiracy.'" (quoting *United States v. Pallais*, 921 F.2d 684, 687 (7th Cir. 1990))). But, as some commentators have observed, "a more practical rationale" underpinning Rule 801(d)(2)(E) may be "necessity," as conspiracies tend to be "secret enterprises" yet "[s]ome of the best evidence—and perhaps essential evidence if a prosecutor is to prove a defendant's guilt beyond a reasonable doubt—will be statements about the conduct of other co-conspirators." Allen, *An Analytical Approach to Evidence* at 518. As a policy matter, then, it is "arguably appropriate to burden a person who chooses to engage in a conspiracy or an ongoing criminal enterprise (particularly, as an organizer or leader) with the risk that false or inaccurate co-conspirators' statements will be used against him or her." *Id.*

Describing Rule 801(d)(2)(E) is easier than applying it. Indeed, cases where parties seek to introduce statements of coconspirators can entail substantial complexity and related risks of uncertainty and prejudice. For at least the last 45 years, district courts have often addressed those considerations by making conditional rulings pursuant to Rule 104 on the admissibility of coconspirator statements. We provided this guidance in *United States v. Santiago*, 582 F.2d 1128, 1131 (7th Cir. 1978), *overruled in part on other grounds by Bourjaily v. United States*, 483 U.S. 171 (1987). Hence, the term "*Santiago* proffer."

These proffers can take different forms. In many instances, a district court may prefer the submission of *Santiago* proffers in writing, with the proponent (often the government in a criminal case) itemizing (often in chart or table format) the statements of coconspirators and the reasons those statements satisfy the foundational requirements of Rule 801(d)(2)(E). See *United States v. Rodriguez*, 975 F.2d 404, 409 (7th Cir. 1992). In other instances, a more summary form of a proffer, written or oral, may be appropriate and sufficient. See *United States v. Alviar*, 573 F.3d 526, 540 (7th Cir. 2009). In still other circumstances, and perhaps following written submissions from the parties, a district court may order "a 'full blown' preliminary hearing to consider all evidence concerning the statements." *United States v. Cox*, 923 F.2d 519, 526 (7th Cir. 1991) (citing *United States v. Andrus*, 775 F.2d 825, 836–37 (7th Cir. 1985)).

On the other hand, and perhaps after receiving a written *Santiago* proffer and getting a sense of the scope and content of coconspirator statements, a district court may prefer to reserve ruling until trial. See *United States v. Shoffner*, 826 F.2d 619, 629 (7th Cir. 1987).

No matter what approach the district court adopts, the watchword is diligence. Rule 801(d)(2)(E) imposes requirements, and the proponent of the statement in question bears the burden of proving those conditions by a preponderance. See *Davis*, 845 F.3d at 286. Rare should be the case when *Santiago* proffers do not occur pretrial. Peril abounds on that path.

### C

No better example than this case. It is complex as a factual and legal matter and replete with pretrial indications that the government sought to introduce a substantial volume of statements by coconspirators. The case cried out for a pretrial assessment of coconspirator statements—a detailed and complete *Santiago* proffer. And remember that the defendants asked for one, only for the district court, at the government's urging, to deny it.

What resulted is a record with dozens of exhibits presented to the jury and loaded with coconspirator statements that the district court did not evaluate prior to trial and instead chose to conditionally admit in their entirety. And before us are defendants who received life sentences and who tried to avoid this precise predicament pretrial by moving for a *Santiago* proffer. They feel jammed and upended—now, after the fact, having to comb the haystack of coconspirator statements admitted at trial to identify specific statements that not only failed to meet the requirements of Rule 801(d)(2)(E), but also likely affected the trial outcome.

As we see it, fault lies across the board. The government should have embraced—not resisted—the defense's request for a *Santiago* proffer. The district court should have ordered one and positioned itself to get a more informed sense of the

forthcoming coconspirator statements and the basis for conditional admissibility or exclusion. And defense counsel needed after trial to move beyond frustration and identify specific coconspirator statements they believe should not have been admitted at trial. See *United States v. Adamo*, 882 F.2d 1218, 1230 (7th Cir. 1989) ("[W]e refuse to comb and search the record in search of 'the statements' of Adamo's coconspirators, if any, which may arguably be inadmissible under Rule 801(d)(2)(E).").

The defendants have fallen short in meeting their obligation. Indeed, they largely seem to resist the requirement, telling us many times over in oral argument that what transpired in the district court was entirely unfair. While we share the broad concern, we see no basis to determine that the district court's failure to require a *Santiago* proffer resulted in some sort of structural error automatically warranting a new trial. See *United States v. Beasley*, 163 F.4th 403, 406 (7th Cir. 2025) ("A preserved trial error is subject to harmless error analysis unless it is a structural error necessitating automatic reversal."). We know of no case law supporting that view. So the task before us is to ascertain whether, in the final analysis, the district court committed reversible error in admitting particular statements of coconspirators. See *United States v. Harris*, 585 F.3d 394, 398 (7th Cir. 2009); see also *United States v. Stephenson*, 53 F.3d 836, 842 (7th Cir. 1995).

We do not see any error. Take, for instance, Warren Griffin's objection to the admission of statements made by Anthony Dobbins in recorded calls and written letters, especially while Dobbins was serving time in Colorado with Larry Hoover. Abundant evidence demonstrated that Griffin and Dobbins were close associates within the Gangster Disciples who

shared a desire not only to further the gang's mission, but also to implement Hoover's vision for new leadership. They discussed these topics in detail in several communications. We have held that "[c]onversations identifying actors within the conspiracy help to 'confirm the lines of command in the organization,' and in that way do, in fact, further the conspiracy." *United States v. Hernandez-Rivas*, 348 F.3d 595, 600 (7th Cir. 2003) (quoting *Pallais*, 921 F.2d at 688); see also *United States v. Musaibli*, 42 F.4th 603, 619 (6th Cir. 2022) ("[S]tatements which identify the participants and their roles in the conspiracy are made in furtherance of the conspiracy." (cleaned up)). At the time in question, Griffin and Dobbins were jockeying for positions of increased authority in the Gangster Disciples. Many of Dobbins' statements discuss how they will achieve that end and were therefore admissible against Griffin. We have no concerns with these statements.

Griffin contests other admitted evidence too, pointing us to a handful of specific out-of-court statements made by other alleged coconspirators. But we are unable to say the district court abused its discretion in admitting any of them. Take, for example, a challenge Griffin brings to statements made during a November 2018 phone call among various unindicted Gangster Disciples. The discussion focused on the status of leadership positions within the gang and the view that Griffin, who was locked up, "was gonna get, uh, Missouri" and that he was "solidified by dad." GX 122T. By its terms, this statement satisfies the requirements of Rule 801(d)(2)(E), as it could have informed the jury's assessment of facts pertinent to the leadership shakeups within the Gangster Disciples during the relevant period.

Consider another example. Griffin challenges a statement made during a 2019 phone call by Barry Boyce, a former defendant who pleaded guilty before trial, in which Boyce states that Griffin had placed "little dude" in charge of Illinois. Griffin tells us that the district court should never have allowed Boyce's statement to reach the jury because he and Boyce were at cross purposes within the Gangster Disciples, thereby preventing any finding that were part of the same conspiracy. See *United States v. Coe*, 718 F.2d 830, 840 (7th Cir. 1983). But we see no error here, as Boyce's challenged statement was about leadership roles and decisions generally within the gang. Even accepting that the two members (Griffin and Boyce) may have harbored different perspectives on leadership matters, the two could still be part of a conspiracy with shared criminal objectives. They both seek to continue the overall success of the larger organization. See *Hernandez-Rivas*, 348 F.3d at 600; see also *Musaibli*, 43 F.4th at 619.

Finally, we owe a word to the district court's finding that many of the challenged out-of-court statements were not hearsay implicating Rule 801(d)(2)(E), but instead idle chatter. We agree that it can be difficult to redact all chatter from recorded discussions. Nor is it necessary to do so, as chatter often adds important context to the true statements of interest. While the district court may have filtered out more idle chatter, see *Pallais*, 921 F.2d at 684, and would have been aided in doing so by a *Santiago* proffer, the defendants have fallen well short of persuading us that the district court committed error on this front.

\* \* \*

We have spilled a lot of ink on what transpired here because it concerns us and was entirely avoidable. The pathway

was a pretrial *Santiago* proffer. These should happen in all but the rarest of cases where a party seeks to introduce statements of coconspirators under Rule 801(d)(2)(E).

No doubt there will be special circumstances where extra precaution needs to be taken with a *Santiago* proffer to protect a witness's identity, ensure safety, and the like. But a ready solution in those instances is to request an *in camera* review of the evidence. See *United States v. Abuhamra*, 389 F.3d 309, 327 (2d Cir. 2004). In still other instances, it may be that the volume and significance of coconspirator statements is so lacking that all parties are comfortable with the district court resolving admissibility questions during trial. No one solution fits all cases. But the norm should be a broad embrace of *Santiago* proffers.

## III

### A

All four defendants also contend the government's evidence was insufficient to support their convictions. On this front they face a heavy burden, as our review, though independent of the district court's assessment of the evidence, must evaluate "the evidence in the light most favorable to the government" and ask whether "'*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *United States v. Elizondo*, 21 F.4th 453, 470 (7th Cir. 2021) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). We have described a defendant's burden of prevailing on a sufficiency-of-evidence challenge as "nearly insurmountable." *United States v. Warren*, 593 F.3d 540, 546 (7th Cir. 2010).

Recall from our summary chart that the jury convicted all defendants on the Count 1 charge of conspiracy to commit a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(d). This offense required proof that (1) "the defendant knowingly conspired to conduct or participate in the conduct of the affairs of [the Gangster Disciples], an enterprise, through a pattern of racketeering activity"; (2) that the Gangster Disciples was "an enterprise"; and (3) that "the activities of [the Gangster Disciples] would affect interstate commerce." *The William J. Bauer Pattern Criminal Jury Instructions of the Seventh Circuit* 852 (2025).

When it came to Count 1, the jury also made express findings that each defendant participated in a murder specified in the superseding indictment as a special sentencing factor. For Smith, Clemon, and Maxwell, the indictment specified the April 28, 2018 murder of Leroy Allen, and for Griffin the May 18, 2018 murder of Ernest Wilson. The jury's special findings had the consequence under 18 U.S.C. § 1963(a) of subjecting each defendant to a possible term of imprisonment for life.

Beyond Count 1, the jury convicted all defendants of aiding and abetting murder in aid of racketeering in violation of 18 U.S.C. § 1959(a)(1) (Count 2 for Smith, Clemon, and Maxwell, and Count 11 for Griffin). Section 1959(a)(1) criminalizes, among other things, a defendant's participation in a murder for the purpose of maintaining or increasing the defendant's position in the enterprise. The jury found Smith, Clemon, and Maxwell guilty on an additional count (Count 5) under § 1959 for attempted murder. The defendants challenge the sufficiency of evidence on each of these convictions too.

Finally, the remaining convictions on Counts 3, 4, 6, 12, and 13 involve the use of a firearm in the underlying offenses,

in violation of 18 U.S.C. § 924(c)(1)(A) and § 924(j)(1). As the defendants seem only to contest their participation in the underlying substantive offenses—not that a firearm was used or caused a particular death—we will not address these counts further.

B

We begin with Warren Griffin. No defendant seems to challenge that he was a member of the Gangster Disciples, that the gang was an enterprise within the meaning of 18 U.S.C. § 1961(4), and that it affected interstate commerce. Our focus, then, for the Count 1 conspiracy charge is on whether sufficient evidence supported the jury's finding that Griffin agreed to engage in a pattern of racketeering activity—defined in § 1961(5) to mean at least two predicate acts of racketeering within ten years. The superseding indictment alleged, among other various plausible acts under § 1961(1), that Griffin aided and abetted the first-degree murder of Ernest Wilson on May 18, 2018 (in violation of 720 ILCS 5/9-1) and trafficking in controlled substances (in violation of 21 U.S.C. § 841(a)).

As for the May 2018 murder, the jury heard ample evidence that Griffin had a motive to kill Wilson. He and Anthony Dobbins regularly discussed older gang members "up north," which would have included Wilson, not embracing their new leadership. About a week before Wilson's murder, Griffin texted Dobbins about Wilson's whereabouts. And on May 18, 2018, the day of the murder, Griffin texted his own address in Glenwood, Illinois to Dobbins, who then drove there from East St. Louis in southern Illinois.

The jury also saw video footage of the Wilson murder. The video showed a white Cadillac, the type of car that Dobbins drove, parking at the corner of 72nd Street and Euclid. It also showed two men stepping out of the car and eventually splitting up. Based on all the evidence, the jury could have inferred that they were Griffin and Dobbins. Griffin then met Ernest Wilson, and Dobbins hid behind a nearby tree. Griffin and Wilson then started walking in the general direction of the tree, only for Griffin to eventually break off and walk in another direction as Dobbins emerged from behind the tree and approached Wilson. Then Dobbins shot and killed Wilson, while also accidentally shooting himself in the leg.

The government's evidence did not end there. Crime scene technicians found a glove containing traces of Griffin's DNA. The jury also learned that, after the murder, Griffin and Dobbins drove from Chicago back toward East St. Louis, where Dobbins went to a local hospital for the gunshot wound to his leg. He told an investigator that he was attacked, a claim that had no support. On this evidence, a reasonable jury could find that Griffin participated in the murder of Ernest Wilson.

So too did the government present sufficient evidence that Griffin participated in a second predicate act of trafficking in controlled substances. The jury heard testimony from several members of law enforcement and a former Gangster Disciple that the gang trafficked in illegal narcotics, especially when money was tight. And the jury heard significant evidence that Griffin was not just a member of, but a leader in, the Gangster Disciples and that he had a close relationship with Dobbins.

Additionally, the jury learned that the Illinois police executed a warrant and arrested Griffin on August 9, 2018.

During the course of that arrest, officers found almost two pounds of marijuana in a backpack in the trunk of Griffin's car. Illinois State Police Master Sergeant Nick Homann testified that, in his experience from other narcotics investigations, that quantity of marijuana and its packaging indicated it was intended for distribution. The officers also found two fake IDs and four cell phones in Griffin's car, and the jury could reasonably infer that someone traveling with those items, alongside the two pounds of marijuana, did not intend to use the drugs for personal use. Noteworthy too was the police's recovery from Griffin's car of a printout of a Bureau of Prisons report related to Anthony Dobbins.

One day later, on August 10, 2018, Illinois police arrested Dobbins at an apartment in East St. Louis. A subsequent search resulted in the police finding cocaine and heroin outside the apartment's window. And inside the home officers located digital scales, sandwich bags, and a machine for sealing bags, which a law enforcement officer told the jury are materials for distributing drugs.

The timing and location of the arrests, the broader evidence of Gangster Disciple drug dealing, and the close relationship between Dobbins and Griffin, all combined with the large quantity of drugs and other indicia of distribution found during the arrests, permitted a finding that Griffin agreed to the trafficking of controlled substances.

## C

We next turn to Frank Smith's sufficiency-of-evidence challenge. Our focus is on two of the predicate acts alleged against Smith for his role in the Count 1 racketeering conspiracy—his participation in the April 28, 2018 murder of Leroy

Allen in Matthews Park in Missouri and conspiring to commit murder under Illinois law for a separate incident.

By way of recapping the Matthews Park incident, a key point to remember is that, around 2017 to 2018, Smith, Griffin, and Dobbins—all close associates—sought to consolidate and enhance their authority within the Gangster Disciples. This occurred at a time when the gang's governor of Missouri was Dushawn Wharton, who reported to Shauntay Craig. After months of expressing his frustration with Wharton, Griffin held a small meeting, ousted Wharton as Missouri governor, and made Christopher Blount interim governor. To publicize this change, Blount planned an event at Matthews Park in Bridgeton, Missouri for April 28, 2018.

The gathering occurred and multiple Gangster Disciples attended. Defendants Sean Clemon and Dominque Maxwell were there as was Perry Harris, who was charged in this case but pleaded guilty and testified as a cooperating witness for the government at trial. Wharton and some of his crew, including Leroy Allen, showed up, causing tension to escalate. Wharton repeatedly attempted to assert his authority as governor of Missouri, resisting any notion that he had been replaced. To seek direction on how to handle the situation, Maxwell, after consulting with Clemon, placed a call to Frank Smith who, in turn, tried to talk Wharton down. When that effort failed, Smith ordered Maxwell to subject Wharton to a beatdown—a "Mike Tyson" as Smith called it. The jury heard testimony from Damien Madison, a former Gangster Disciple, that the term "Mike Tyson" was a reference to the former champion boxer, one with a reputation for intense and powerful punching. Within the gang, Madison explained, the term

served as a direction to subject someone to extreme violence, like a stabbing or shooting.

Maxwell followed Smith's order. Specifically, the jury heard eyewitness testimony that Maxwell struck Wharton in the back of the head, which prompted a firefight within the park that ended with Wharton shot in the stomach and Leroy Allen shot and killed. When the shooting stopped, Maxwell texted Smith one word: "Done."

On this evidence, the jury could have found that Smith committed the predicate act of murder by ordering the "Mike Tyson." His conduct also satisfied the requirement for an enhancement under Count 1, as well as the elements of Counts 2, 3, 4, 5, and 6—murder and attempted murder in aid of racketeering and the related firearm offenses. And for Count 2, under § 1959(a)(1), punishing insubordination, especially when it occurs in front of other subordinates, is a textbook example of maintaining authority.

That brings us to a second predicate act of racketeering alleged against Smith—conspiracy to commit murder in Illinois. On this charge, the government introduced evidence that, on December 30, 2019, Maxwell asked Smith for help finding someone in a federal prison. Smith responded by providing the inmate's information and name of the prison, and from there Maxwell asked if they "got people there … I need to holla at Mike Tyson." Smith responded by supplying additional information. All of this occurred within two years of the Matthews Park shooting of Dushawn Wharton and murder of Leroy Allen. A jury could have inferred from this additional activity that Smith agreed with Maxwell to arrange a murder within an Illinois prison.

D

Sean Clemon and Dominque Maxwell filed a combined brief contesting the sufficiency of the evidence against them. For Count 1, they concede the government introduced evidence of witness tampering, a predicate act under 18 U.S.C. § 1961(1). For a remaining predicate act in Count 1, the trial evidence showed that they were triggermen for the shooting in Matthews Park on April 28, 2018. So the jury had overwhelming evidence to convict Clemon and Maxwell on Count 1.

For Counts 2 and 5—murder and attempted murder in aid of racketeering—Clemon and Maxwell contest, like the other defendants, whether their acts were done to maintain or advance their position in the enterprise. But Clemon and Maxwell personally benefited from the violence. After the shootout, Clemon took over as governor of Missouri and Maxwell stepped in as assistant governor. We see no need to belabor this issue further. We find no deficiency in the jury's guilty finding for Counts 1, 2, 3, 4, 5, or 6.

IV

That brings us to a series of other issues raised by the defendants.

A

Dominque Maxwell alone challenges the district court's denial of his motion to suppress the gun that killed Leroy Allen in Matthews Park on April 28, 2018.

On November 23, 2019, a federal agent overheard Maxwell tell an informant that he was drinking and might assault a rival. The agent relayed this information to local law

enforcement, who found Maxwell driving in Cape Girardeau, Missouri and observed him commit a turn signal violation. A local police officer then stopped Maxwell and, while retrieving and running his driver's license, police requested a canine sniff. The canine arrived about seven minutes into the stop and three minutes after being requested, before the officer completed the citation. The dog alerted while circling Maxwell's car, and a subsequent search turned up a Ruger 9mm handgun.

Maxwell moved pretrial to suppress the handgun. The district court denied the motion, finding that that the collective knowledge doctrine applied and allowed the local police officer, upon the request of the federal agent, to stop Maxwell for the traffic violation.

Evaluating the factual findings of a motion to suppress for clear error and taking a fresh look at legal conclusions, *United States v. Devalois*, 128 F.4th 894, 898 (7th Cir. 2025), we agree that the collective knowledge doctrine applied. Upon hearing that Maxwell was drinking and looking to hurt someone, the federal agent sought assistance from local authorities, leading a nearby officer to conduct a lawful car stop. See *United States v. Williams*, 627 F.3d 247, 252–53 (7th Cir. 2010). Nor, having reviewed the timeline of the pertinent events, do we see any unreasonable delay or other infirmity in requesting the canine sniff. See *United States v. Simon*, 937 F.3d 820, 831–32 (7th Cir. 2019) (citing *Illinois v. Caballes*, 543 U.S. 405, 410 (2005)); see also *United States v. Bentley*, 795 F.3d 630, 635 (7th Cir. 2015) ("An alert from an adequately trained and reliable dog is sufficient to give rise to a finding of probable cause.").

B

Dominque Maxwell, joined by all defendants, contends that the district court erred in handling a prospective juror's unprompted comment during voir dire that the Gangster Disciples, at some point in the past, had put a hit out on him. We see no error.

We review a district court's decision whether to dismiss prospective jurors for an abuse of discretion. See *United States v. Thomas*, 161 F.4th 1082, 1085 (7th Cir. 2025). If jurors hear an improper comment during voir dire, we must discern whether any manifest injustice resulted—specifically, whether the improper comment would prevent other jurors from being impartial. See *id.* at 1086.

The district court handled this issue with considerable care and ultimately dismissed the person while taking a step to confirm the remaining prospective jurors' impartiality. We see no error whatsoever. See *id.* (finding no abuse of discretion when the district court refused to dismiss an entire venire when a venireperson said in her experience that the police only brought sound charges).

C

Griffin, Clemon, and Smith invoke Federal Rule of Evidence 801(d)(2)(E), and challenge the district court's decision to permit Damien Madison to testify. Madison was an imprisoned former Gangster Disciple from Colorado who volunteered to cooperate in this prosecution in the hope of receiving a reduced sentence. Although distinct from the Rule 801(d)(2)(E) challenges addressed earlier in our opinion, this one also falls short.

Madison testified about his role in and understanding of the organization and operation of the Gangster Disciples, which he became involved with when he was around thirteen years old. He discussed his early role as a treasurer in the organization, and how the gang made money selling narcotics. And he told the jury about his time as the organization's governor of Colorado, a role he assumed in 2017. He explained his familiarity with the Gangster Disciples' governance structure to the jury. We find no error in the admission of this testimony under Rule 801(d)(2)(E) or otherwise.

The defendants also focus their objection on a few of Madison's specific statements. At one point, he testified that he recognized the term "Mike Tyson" and told the jury that, as used within the Gangster Disciples, it referred to "extreme violence" like a shooting or a stabbing. Madison also identified Frank Smith as a board member.

Even if we were to consider Madison's explanation of a "Mike Tyson"—or his identification of Smith as a board member—to be inadmissible hearsay, the admission of the statements would be harmless. When Smith gave the direction to Maxwell to "Mike Tyson" Dushawn Wharton in Matthews Park on April 28, 2018, the deadly firefight broke out that took Leroy Allen's life and left Wharton shot in the stomach. Afterward Maxwell texted, "Done." That was enough for the jury to infer the meaning and intent behind Smith's order for a "Mike Tyson." As for Madison's identification of Smith as a board member, the jury already had enough to find that he had a leadership role, as Smith's attorney acknowledged at closing argument. We find no reversible error here.

D

We come in closing to Warren Griffin's contention that the district court committed error in admitting cellular telephone location data at trial. The government introduced this evidence principally as part of proving Griffin's involvement in the May 2018 murder of Ernest Wilson. While we have some reservations with the district court's admission of aspects of the evidence, any error was harmless.

Before trial Griffin invoked Federal Rule of Evidence 702 and the Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and moved to exclude the government's expert testimony and evidence related to historical cell-site information. The district court held a hearing and heard testimony from FBI Special Agent Greg Catey, a member of the Bureau's Cellular Analyst Survey Team. The testimony focused on Agent Catey's training and experience as well as the reliability of information in an exhibit Agent Catey prepared. That exhibit depicted on a map location data, presented by reference to cellular towers, for phone calls from numbers associated with Dobbins and Griffin. The exhibit showed the locations of the phones at various times on May 18, 2018, the date of the Ernest Wilson's murder.

Agent Catey reached specific conclusions. Based on which side of a tower a phone connected to, he determined the general direction of the phone at a given time in relation to that tower. And based on the perceived areas of coverage of the towers, Agent Catey formed even more specific opinions about where the phones might be at specific times. He marked other points of interest on the maps, including Dobbins' home address near East St. Louis, Griffin's home address closer to Chicago in Glenwood, Illinois, and the location of Ernest

Wilson's murder in the south side of Chicago. The hearing made clear that the government intended to rely on Agent Catey's opinions to show that Griffin traveled to the scene of the murder.

The district court denied Griffin's motion to exclude and at trial qualified Agent Catey as an expert and admitted his testimony and the exhibit. On appeal Griffin contends that Agent Catey's analysis and mapping was not based on sufficient facts or data and was unreliable and unduly prejudicial because his opinions about the likely location of Griffin's and Dobbins' cell phones before and during the murder of Ernest Wilson were more precise than permitted by the underlying data.

Griffin grounds his contentions in our decision in *United States v. Hill*, 818 F.3d 289 (7th Cir. 2016). There we allowed historical cell-site analysis to show a phone was traveling in a general area, but we were hesitant to allow the evidence to get too specific. See *id.* at 298–99. We cautioned "the government not to present historical cell-site evidence without clearly indicating the level of precision—or imprecision—with which that particular evidence pinpoints a person's location at a given time." *Id.* at 299. Agent Catey may have exceeded this limit at trial by getting too specific as to the location of Griffin's and Dobbins' cell phones in the time before and after the Wilson murder.

But we are confident any error was harmless. Recall that the government presented the jury with significant, if not overwhelming, evidence linking Griffin (and Dobbins) to the murder of Ernest Wilson. That evidence included a motive and a glove recovered from the crime scene containing Griffin's DNA. It also included a map that more generally showed

Dobbins' cell phone moving from East St. Louis to Glenwood where Griffin lived, and then, later in the day, both Griffin's and Dobbins' phones traveling south from Chicago to East St. Louis where Dobbins lived. This more general location data easily passes muster under *Hill*. All this evidence was more than sufficient to convince a jury, beyond a reasonable doubt, of Griffin's involvement in the Wilson murder. In short, any error in admitting the more specific opinion testimony of Agent Catey was harmless.

\* \* \*

In the final analysis, and for these reasons, we AFFIRM.